LUTHER E. HALL, Judge pro tem.
Plaintiffs, wholesale fur merchants in the city of New Orleans, shipped four bales of muskrat furs to New York via defendant Airline. One bale of fur was rejected by the buyer in New York because the packing had been damaged. According to the uncontradicted testimony of plaintiffs, the defendant Airline’s New Orleans manager agreed that the furs would be returned to New Orleans to be repacked at the Airline’s cost and then returned to New York.
The bale of furs, its packing damaged but otherwise in good condition, was thereafter placed on one of defendant Airline’s planes to New Orleans. However, upon delivery to plaintiffs in New Orleans the furs were found to have been severely damaged by a liquid chemical substance.
This suit demanded $3,900.00, the value of the furs, from both the Airline and from plaintiffs’ transportation insurer. The District Court gave judgment against defendants in solido for $3,150.00, being the value of $3,900.00, less $750.00, which the Court found to be the salvage value of the furs. Both defendants have appealed.
The insurer’s defense was that the policy it issued defendant did not afford coverage against losses during carriage by air. The “transportation endorsement” reads, at its very beginning,
“This policy insures shipments consisting of the property insured for the following amounts in any one loss:
$30.000.00 while in the custody of any Truckman or Trucking Company,
$30,000.00 while in the custody of any Railroad or the Railway Express Agency (including while on ferries and/or in railroad cars on transfers or lighters),
$4t000t# while m the custody of A«? Carriers oe Air Express Companies, (sic)
$30,000.00 during transportation to and from conveyances or premises of the above described carriers, in motor trucks or trailers operated by the Assured.”
The three “$30,000.00” figures are typed into the blanks, and the $1,000.# is printed in the form. The line providing coverage *807 while in the custody of air transport companies is stricken out in ink. The insurer contends the policy therefore expressly eliminates protection against losses during air transportation.
The plaintiffs contend the lining-out of this provision was intended only to eliminate the printed limit of $1,000.00, which, plaintiffs argue, would have been altogether inadequate coverage for their valuable fur shipments. Plaintiffs point to another portion of the printed contract which mentions “aircraft”, as well as the provision for insurance against “all risks” except as excluded ; and plaintiffs also claim the insurer accepted premiums on account of air shipments.
In our opinion plaintiffs’ explanation of the purpose of lining-out the entire coverage clause is unacceptable. The obvious and simpler procedure to increase air coverage limits would have been the striking out of “$1,000.#” and typing in of “$30,000.00” (claimed to have been the amount of coverage), at the same time the other coverage limits were typed in.
The additional reference to “aircraft” occurs in an exclusion clause denying coverage for specified damages (not involved here) “unless caused by * * * crashing of aircraft” (also not involved here). Having no doubt that the striking out of the entire air coverage clause intended to eliminate such coverage entirely, we are satisfied that the quoted printed provision, to the extent it may conflict with that intention, was left in by oversight, does not reflect any intention to provide air coverage, and must be disregarded in the present context. It is “a general rule of interpretation of contracts that written or typewritten words prevail over conflicting printed matter.” Dean v. Pisciotta, 220 La. 725, 57 So.2d 591 (1952), and authorities there cited. In respect to the present contract, we hold that the deletion is the equivalent of a specially written provision against coverage of air shipments and must be upheld regardless of the undeleted casual reference to “aircraft” in another part of the printed form. The same reason prevents “all risks” from being interpreted to include “risks during air transportation”, even if it were not clear that “all risks” are insured against only while the goods are in trucker’s, railroad’s or insureds’ hands.
Plaintiffs’ claim that the insurer accepted air shipment premiums is based on the fact that plaintiffs included, in their reports to the insurer for final premium adjustment, the value of air shipments. The policy provided for an initial “premium” of $1,000.00 to be adjusted at the end of the policy year to make the actual premium 50fS per $100.00 of the value of “all shipments covered hereunder”. Plaintiffs’ reports merely stated the total value of all shipments, and did not disclose that any of the shipments were made by air. Thus plaintiffs’ inclusion in these reports of the value of air shipments, while it may indicate plaintiffs thought they had air coverage, does not estop the insurer to deny the coverage. The insurer has tendered the return of all amounts attributable to plaintiffs’ mistaken inclusion of air shipments in its premium adjustment reports.
We conclude plaintiffs’ claim against the defendant insurer may be rejected.
The Airline’s basic defense is the limitation of its liability to 50^ per pound, or a total of $206.00, as required by the Civil Aeronautics Board official airfreight rules tariff. Pertinent statutes are 49 U.S. C.A. § 1301 ff., especially section 1373. Under tariff rules 3.3 and 4.3 (by law part of the contract of carriage) there is no doubt that the Airline’s initial liability was limited as claimed, as of the time the shipment first arrived in New York with the packing damaged. The Airline at that time could have paid plaintiffs only the lesser of $206.00 or the actual damages, and plaintiffs would have had no further claim against the Airline. A promise by an agent of the Airline to pay more would have been unenforceable, since the tariff provisions cannot be altered. See tariff *808 rule 3.1; Wittenberg v. Eastern Air Lines, 126 F.Supp. 459 (D.C.S.C.1954). And clearly the purpose of the regulations would prevent the Airline from undertaking to repair damage knowing that the cost of the repair would exceed the amount to which liability is limited; and a promise to make such repairs under the circumstances would be unenforceable.
What the Airline did in the instant case, according to the only positive testimony, was to promise that, instead of simply standing on the top limit of $206.00 liability, it would ship the furs to New Orleans, have plaintiffs repair or replace the damaged packaging, and ship the furs to New York again, all at the Airline’s cost. It does not appear that this promise by the Airline was a promise to expend more than the $206.00 limit of its liability. We think this is no different from a promise by the Airline to repack the furs itself. We are of the opinion that, had the Airline undertaken to repack the furs itself, the Airline would no longer be acting in its capacity as an airfreight carrier, but as a fur-re-packer; and its negligent destruction of the furs during re-packing would have rendered it liable for their full value.
When the Airline elected the course it took, while it acted with the consent of the shipper, it nevertheless was acting for itself, in discharge of its own liability (albeit a liability limited to $206.00). Thus it was not performing the usual contract for shipment of freight by air, when it shipped the furs from New York to New Orleans; nor was this a simple “return” of freight such as tariff rule 3.1(b) contemplates ; and we hold that the tariff regulations are inapplicable to the New York to New Orleans flight, on which the damage occurred.
As stated above, the only positive testimony establishes the agreement for the course of action embarked upon by the Airline. The Airline showed that, in fact, it did put the bale of fur upon its plane with the uniform airbill, two copies of which, under usual delivery and invoicing procedures, reached the plaintiffs. Further, the Airline offered the deposition of its Florida accounting office manager, with supporting records, to show that according to the Airline’s records, the invoice in the amount of $59.95 was paid. But the Airline’s search of plaintiffs’ records failed to show a payment in that amount by plaintiffs during that time, and plaintiffs denied that they paid the invoice. Accordingly, the Airline’s evidence does not imply any inconsistency with or contradict the plaintiffs’ testimony as to the arrangements made.
The only agent of the Airline with whom plaintiffs testified they made the arrangements, and who could have denied plaintiffs’ testimony, was not produced to testify, nor was his deposition taken. We conclude plaintiffs have proved the special agreement for repairing the initial damage to the packing of the bale of fur, and that the fur was in the Airline’s possession under that agreement, and not under the original contract of carriage.
The Airline’s final defense is that, if it did hold the furs other than as an airfreight carrier, it was a gratuitous bailee and is liable only for its gross negligence. The Airline held the furs as part of its method of satisfying plaintiffs’ claim for the initial damages, and was therefore a compensated bailee. The doctrine of res ipsa loquitur is applicable in bailor-bailee relationships; Lehigh v. Johnson-Evans Motors, 75 So.2d 710 (La.App.1954) is pertinent under the facts here, where the furs were soaked with a chemical substance, while both the furs and the chemical were in the control of the Airline; and the Airline introduced no evidence to rebut the presumption of lack of due care on its part. Accordingly, the Airline is liable for the damage to the furs.
On quantum, the Airline further argues that the furs had a salvage value of *809 $1,500.00. Mr. Rubenstein, an expert fur merchant, testified that the 3,000 skins in the damaged bale were worth an average of 50$ each. He was not familiar with the chemical substance which had soaked the bale, but concluded from his visual examination of 400 or 500 skins that the 3,000 could be sold to special foreign tanners for about 50$ per skin. These special tanners alone handle skins such as these; “we call it tainted skin, * * * and that is something that you don’t know 100% what will happen to it when it goes into the tannery”. Mr. Rubenstein also testified that from 20 to 30 per cent of the skins were not damaged.
Plaintiffs had sent four to six of the skins to a local tanner, Mr. Zimmerman, who testified they were worthless because the hair came loose and fell out. Mr. Zimmerman took initial steps in the tanning process, but did not go through with it because of the evident damage to those few skins. Mr. Rubenstein testified that no one locally was able to do the special tanning work done in the European tanneries which would buy the skins. One of the plaintiffs testified they had had other tainted skins available, offered by them at 20$ per skin during the past two years, but were unable to sell them.
The District Court allowed 25$ per skin salvage, a total of $750.00. We are unable to find a higher salvage value, in view of Mr. Rubenstein’s lack of experience with the chemical involved, and plaintiffs’ positive testimony they had been unable to sell tainted skins at 20$ per pelt.
For the foregoing reasons, the judgment of the District Court is affirmed insofar as it awarded judgment in favor of plaintiffs and against Aaxico Airlines, Inc.; and it is reversed insofar as it awarded judgment against United States Casualty Company. Defendant Airline to pay costs; except that plaintiffs are to pay costs of defendant insurer.
Affirmed in part, reversed in part.